# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| CHARLOTTE MILLER, | ) | |
| Plaintiff-Claimant, | ) | |
| | ) | No. 11 CV 50141 |
| v. | ) | Magistrate Judge Iain D. Johnston |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security | ) | |
| Defendant-Respondent. | ) | |


## MEMORANDUM OPINION AND ORDER

The Claimant brings this action under 42 U.S.C. §405(g), seeking reversal or remand of the decision by Respondent, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner")[1], denying the Claimant's application for disability insurance benefits under Title II of the Social Security Act.  This matter is before the Court on cross-motions for summary judgment by the Claimant [24] and the Commissioner.

The Claimant argues that the Commissioner's decision denying her application for benefits should be reversed or remanded for further proceedings because the Administrative Law Judge's ("ALJ") decision is not supported by substantial evidence and is contrary to law.  The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence.  For the reasons set forth more fully below, the Claimant's motion for summary judgment is granted, and the Commissioner's motion for summary judgment is

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

denied. The Commissioner's decision is reversed, and this matter is remanded to the Social Security Administration ("SSA") for further proceedings consistent with this Memorandum Opinion and Order.

# I. BACKGROUND

## A. Procedural History

The Claimant filed an application for benefits on April 19, 2007, alleging a disability onset date of December 17, 2004, due to hip arthritis with replacement and hypertension. R. 31, 446. The application was denied initially and on reconsideration. R. 33, 37. The Claimant filed a timely request for a hearing on February 22, 2008. R.42. The ALJ conducted a hearing on December 4, 2008 in Evanston, Illinois, at which the Claimant, her husband, Medical Expert Dr. Julian Freeman, and Vocational Expert Linda Gels testified. R. 442.

On May 17, 2010, the ALJ issued a decision denying the claim for benefits. R. 18-30. On May 25, 2010, the Claimant filed a timely request for review of the ALJ's decision. R. 13. On March 8, 2011, the Appeals Council denied the request, making the ALJ's decision the final decision of the Commissioner. R. 5. The Claimant then filed this appeal pursuant to 42 U.S.C. §405(g).

## B. Hearing Testimony

### 1. Claimant and Her Husband

At the hearing, the Claimant was 61 years old and represented by counsel. R. 31, 442. The Claimant testified to a 12th grade education and to a work history spanning from 1989 until December 2004. R. 449. For three months in 1989, the

Claimant served as a pharmacy technician, which involved spending eight hours a day on her feet. R. 454. From 1989 to 1994, the Claimant was an office manager for a doctor, where she was seated eighty-five percent of the time and at most lifted five pounds. R. 449. Next, the Claimant worked from 1994 to 1999 in an attorney's office performing computer-based work. R. 450-51. In 1999, the Claimant transitioned to a different doctor's office where she had essentially the same duties as at the previous doctor's office. R. 451. In an unspecified year, the Claimant moved to her final job where she collected and sorted medical charts and performed computer work at an OB-GYN clinic. R. 451-52.

The Claimant testified that she stopped working on December 17, 2004, due to pain in her hips. R. 453. She testified that she began experiencing pain in her hips, under her legs, and on the tops of her feet in September 2004, and that she did not routinely walk at this time, other than while working. R. 452, 471. She started taking ibuprofen for relief, but by December 2004 could no longer withstand the pain and stopped working. R.452-53. The Claimant stated she did not immediately see a doctor because she and her husband moved from Arizona back to the Chicago area. R. 453, 178. She did not look for work after returning to Chicago. R. 453. Claimant stated that the move was not a factor in her remaining off work, but could not say if she would have looked for work had she remained in Arizona. R. 453.

The Claimant and her husband testified that, following her doctor's advice, she underwent surgery to replace her left hip in June 2005. R. 457. The Claimant's husband testified that after the physical therapy that followed, she was still in

"recovery mode" and not able to function at her prior level. R. 457-58. Her husband testified that he started working from home to assist her with her daily life, including putting socks, shoes, and jeans on her, removing pots and pans from lower cabinets so that she could cook, shopping for groceries and cleaning. R. 457, 463, 465. The Claimant's husband also testified that he refitted their bathroom to make it more accessible, including installing shower handles. R. 465-66. The Claimant's husband stated that although her ability to function did not return to her pre-injury level, it did improve as a result of the surgery. R. 458. He also stated that her pain stopped, but she couldn't stoop. R. 458.

The Claimant's husband testified that by the end of 2005, the Claimant could not find a job that accommodated her discomfort. R.458-60. He recalled correspondence with one employer concerning a position that required her to sit four hours straight at a computer, which she would be unable to perform because she needed to get up after thirty minutes to walk around for ten to fifteen minutes. R. 458-59. He testified that in 2006-2007 there was a "little bit of stability" after the first surgery, during which the Claimant was "doing okay." R. 460. He stated the Claimant wasn't able to return to running marathons, like she had done before the surgery, but had an employer permitted her to work from home and move about during her workday, he speculated she "may have been able to work." R. 460.

After the first surgery and subsequent physical therapy, the Claimant spent her days sitting at the computer for roughly thirty-five minutes and then walking around for a time before returning to sit. R. 463. If the Claimant sat for too long,

she experienced pain. R. 464. The Claimant testified that she had trouble sleeping at the time because she felt pain on her right side. R. 464. She slept approximately four hours a night and took naps during the day. *Id.* The Claimant could not get into the driver's seat of a car by herself and using the pedals hurt, so she did not drive or run errands. R. 464-465. The Claimant testified that the couple's social activities were limited to an occasional dinner out. R. 465.

The Claimant testified that after the June 2005 surgery, her left hip improved significantly and for a "short period" of time she felt "pretty good." R. 461. But just as her left hip improved, she alleged that her right hip started to deteriorate. R. 461. The Claimant could not pinpoint when the pain began on her right side, but her attorney pointed to her October 3, 2005, medical record diagnosing osteoporosis in her right hip with a 5.5 times greater risk of fracture than for most premenopausal women. R. 217, 462. The Claimant stated that she continuously put off surgery on the right hip because the recovery period for the left hip had lasted so long. R. 461.

The Claimant underwent a right hip replacement surgery on July 21, 2008, and five weeks of physical therapy thereafter. R. 466-67. When Dr. Freeman asked the Claimant at her December 4, 2008, hearing about her ability to ambulate following surgery and therapy, the following exchange ensued:

Claimant: We usually walk down a block and back up.

Dr. Freeman: Is that comparable of a city block? A city block is an eighth of a mile.

Claimant: Yeah, I know. About a city block, probably shorter than that.

| Dr. Freeman: | Could you walk an eighth of a mile at this point in time? |
|---|---|
| ALJ: | Meaning one block? |
| Claimant: | City block? |
| Dr. Freeman: | Now if you have been in downtown Chicago that's two downtown blocks. |
| Claimant: | No, that's too long. |
| Dr. Freeman: | So even at this point in time you can't reach that distance? |
| Claimant: | Right. |

R. 469-70. Claimant also stated she could not walk an eighth of a mile in the Fall of 2007. R. 470. Claimant further stated that driving still causes her pain in her right leg. R. 477-78.

### 2. Medical Expert

An independent medical expert, Dr. Julian Freeman, testified at the hearing in response to the testimony of the Claimant and her husband. R. 472. Dr. Freeman reviewed the Claimant's medical records, and noted that the radiologist who performed the 2005 MRI found inflammatory arthritis in the Claimant's pelvis and hips. R. 473. Dr. Freeman noted that the radiologist's report conflicted with the treating physician's diagnosis of simple degenerative arthritis. R. 473. Dr. Freeman concluded that the Claimant's symptoms are "more typical of inflammatory arthritic change than degenerative." R. 473.

Additionally, Dr. Freeman noted a treating physician's record from June 2008 that Claimant could walk "at least and more than a block in distance." R. 473. He

noted that the Claimant's testimony conflicted with this record. R. 473-74. Nevertheless, he concluded that Claimant's testimony about her limited ability to walk was supported by the radiologist's MRI in that inflammatory arthritis would cause a "fairly marked limitation in mobility." *Id.*

On October 1, 2009, the ALJ submitted three post-hearing questions and one clarification request to Dr. Freeman. The first question asked Dr. Freeman to list Claimant's medically determinable physical impairments that are severe and expected to last longer than twelve months. R. 435. In response, Dr. Freeman listed degenerative arthritis of the left hip treated with arthroplasty (total hip replacement) and possible right hip degenerative arthritis. R. 440. Dr. Freeman opined that these impairments are severe. R. 440.

In response to the ALJ's second post-hearing question concerning whether Claimant met a listing, Dr. Freeman stated that "Listing 1.03 is met if ambulation is considered ineffective." R. 440. Dr. Freeman testified that ambulation would be considered ineffective if Claimant's testimony—that she cannot walk more than a half block—is accepted as credible. R. 440. In contrast, Dr. Freeman stated that if her treating physician's reports are credited—that Claimant was only mildly to minimally limited and presumably could walk more than a half block—then the listing would not be met. R. 440. Dr. Freeman did not restrict this opinion to any period of time.

In answering the ALJ's third post-hearing question, Dr. Freeman addressed the Claimant's residual functional capacity ("RFC"). Dr. Freeman stated that the

Claimant's RFC would be limited to walking and standing a total of two to four hours a day, but interspersed throughout the day in separate five to ten minute intervals. R. 440, 475-76.[2] Dr. Freeman stated that Claimant may or may not be able to sit for "six to eight hours with occasional shifts in position," where "occasional" is defined as one to two times per hour. R. 475. Dr. Freeman clarified that a "shift" could either be an adjustment while sitting or a moment to get up and walk around, depending on the individual. R. 475-76. Dr. Freeman additionally stated that the Claimant is limited to "no ladder, rope, or scaffold climbing and no activities at unprotected heights, occasional use of foot controls requiring high levels of foot pressure; lifting, carrying, pushing, or pulling 20 lbs rarely, 10 lbs occasionally or frequently." R. 440. He stated that a full crouch is precluded and that the Claimant can bend and kneel only occasionally. R. 475.

Lastly, at the ALJ's request, Dr. Freeman attempted to reconcile the discrepancy between the Claimant's expressed inability to walk and the treating physician's assessments to the contrary:

> [u]nfortunately, the answer probably resides primarily in misperceptions of reality on the part of both the treating physician and the individual herself. The original joint replacement was done in a setting of much less severe anatomic arthritic change than usually occasions this surgery. There also is a significant mismatch between the severity of arthritis noted on MRI and xray at the hip, and what was reported with great brevity, to have been found at surgery. While such mismatches can occur, the degree noted in the records is quite marked.

---

[2] This is an area where Dr. Freeman's post-hearing testimony differs from his hearing testimony. At the hearing, Dr. Freeman stated the Claimant is limited to "two to three hours of walking and standing a day." In his post-hearing answers, Dr. Freeman relaxed the limitation to walking and standing for two to four hours a day. The discrepancy is not outcome determinative.

This mismatch strongly suggests the treating physician was relying on superficial impressions rather than well established data, both in determining the possible utility for surgery and in assessing its success. The surgeon's mindset that the surgery 'should have been' successful appears to have influenced his assessment of how successful the surgery had been.

The other factor is the notation in the records that the individual emphasized physical activity in the past such as marathon running. This prior mindset and method of coping with problems in life likely would leave her disheartened and disappointed with the result of arthroplasty, particularly if that surgery were done in a setting of only moderate arthritic damage. The functional recovery for individuals in situations like this tends to be significantly worse than usual, due to the marked discrepancy between expectation, and the reality of the outcome.

For these reasons, it is more likely than not, that the individual was providing a factually accurate description of her ambulation ability as it actually existed after surgery, that such was being overestimated by her treating physician, and that listing 1.03 is met. The medical reports in file also contain no indication that the treating physician actually observed the stated level of activity by the individual. Finally, note is made of the finding on consultative examination of significant right lower extremity weakness. This clinical finding is consistent with the individual's statements regarding walking ability, but is inconsistent with both the functional estimates and examination findings of the treating physician and suggests error in either or both such findings and statements by the treating physician.

R. 441. Again, Dr. Freeman did not restrict this opinion to any particular period of time.

### 3. Vocational Expert

A vocational expert, Linda Gels, testified to the following at the hearing: Claimant's skills from her work history fell between semiskilled and skilled, and within the light exertion activity categories. Claimant's pharmacy technician position fell at the low end of semiskilled, with such light exertional activity as

lifting less than ten pounds and standing and walking. R. 455. The office manager position included account setup, payable, receivable and payroll for fifty employees and was pegged as sedentary and skilled. R. 455. The medical receptionist position had similar duties, and was considered sedentary and semiskilled. R. 455-56. The VE also noted that there was not a specific DOT entry for a medical receptionist, but Claimant's duties seemed to include some duties of a "medical records clerks," as this is consistent with lifting fifteen pounds of medical files. R. 456. The medical receptionist position was considered semiskilled. R.456. The VE found that the attorney assistant position was similar to the medical receptionist position and so was sedentary and semiskilled. R. 456.

## C. Medical Evidence

Claimant submitted numerous batches of evidence to the SSA, including one batch the morning of the hearing. R. 443.

Claimant first saw Dr. Madhumati Mehta on February 18, 2005, reporting pain that began in December 2004 in her right buttocks, sometimes in her thigh, and anterior aspect of her leg or foot. R. 178. Dr. Mehta noted "remarkable tenderness over the right hip" and that "hip movements, particularly the abduction is remarkably reduced bilaterally." R. 178. Dr. Mehta noted the Claimant's reports that the pain comes and goes, but most of the time is there, and interrupts her sleep. R. 178. One of Dr. Mehta's notes indicates that the Claimant was "newly retired." R. 178.

On April 14, 2005, an x-ray found a moderate to significant decrease in joint space along the superior aspect of her left hip and "prominent changes of arthritis in [the] left hip." R. 194. On May 5, 2005, an MRI of her pelvis found joint effusion, suggested osteoarthritis, found degenerative arthritis change likely, and noted that septic arthritis was difficult to exclude. R. 195.

On May 5, 2005, Claimant saw Dr. Daryl Luke who concluded she had osteoarthritis of the hip and noted it was much greater on left side than on right. R. 179. He noted that the Claimant's range of motion was limited and painful. R. 179. The Claimant told Dr. Luke that "onset was approximately 3 months ago." R. 179. Claimant also saw Dr. Walter Beusse in April and May of 2005, who noted pain in legs, knees, ankles, and feet. R. 181-86. One notation appears to say that the Claimant is unable to walk. R. 183.

On June 12, 2005, treating physician Dr. Nourbash noted severe osteoarthritic changes involving the left hip and found the left hip suffered from a restricted range of motion with significant pain. R. 197. Dr. Nourbash assessed the Claimant with left hip arthritis, and recommended left hip arthroplasty (hip replacement surgery). R. 197. Dr. Nourbash performed the surgery on June 21, 2005. R. 119, 198. After approximately two and a half weeks of physical therapy, the physical therapy provider noted that the Claimant "ambulates indep[endently] with [a] walker and has begun to amb[ulate] with [a] cane." R. 216.

Dr. Nourbash noted the following about the Claimant's recovery: On July 6, 2005, the Claimant reported no pain and Dr. Nourbash noted no problems. R. 208.

On August 3, 2005, Dr. Nourbash noted that the Claimant was using a cane in her right hand to ambulate and that the Claimant stated she was doing "really well." R. 209. On September 14, 2005, Dr. Nourbash again noted that the Claimant reported doing "really well" and he instructed her to return in September 2006. R. 210. After the September 2006 appointment, Dr. Nourbash found the Claimant to be "100% improved" and noted that she "denies any pain or limitation," "is taking no medications," "is ambulatory with no aid," "is fully weightbearing," "continues to work full duty," and had "normal muscle strength." R. 211. Additionally, on October 3, 2005, a bone mineral density test of the Claimant's right hip revealed osteoporosis that made her 5.5 times as likely to fracture her hip than a normal premenopausal female, despite the preventative use of Fosamax. R. 217.

The next entry into the Claimant's medical record is dated nearly two years later when the Claimant visited Dr. Roopa Karri on July 10, 2007, for a consulting examination at the Commissioner's request. The Claimant denied pain in her left hip, but reported that right hip arthritis had worsened over the past two years. R. 241. She reported that she could not support her right leg while walking without a cane and that pain radiated from her right groin to her right ankle. R. 241. She reported osteopenia and that she can stand for only twenty-five minutes and sit for only five minutes. She reported that she drove occasionally, but did not use the stairs or do chores, and that she used shower rails for stability. R. 242. Dr. Karri found moderately decreased range of motion in the hips, tenderness in the right hip,

and severe osteoarthritis in the hips. R. 242, 244.  He found that the Claimant could

not walk fifty feet without support. R. 243.

On July 24, 2007, the Claimant saw State agency physician, Dr. Ernst Bone,

for a Physical RFC Assessment. R. 246.  Dr. Bone found that the Claimant could lift

twenty pounds occasionally and ten pounds frequently, stand for only two hours

total with an assistive device during an eight hour workday, sit for six hours total

during an eight hour workday, and perform unlimited pushing and pulling. R. 247.

Additionally, Dr. Bone found that the Claimant could only occasionally balance,

climb ladders, stoop, kneel, crouch or crawl, but could frequently climb stairs or a

ramp. R. 248.

On October 3, 2007, the Claimant saw Dr. Nourbash for an Arthritis RFC

Questionnaire.  Dr. Nourbash noted a reduced range of motion in both hips and

right hip arthritis with symptoms including right groin pain and precipitating

factors including strenuous activity. R. 276.  He stated that she may eventually

need a right hip replacement. R. 276.  Dr. Nourbash noted the Claimant could sit

for more than two hours before needing to get up, and could walk more than eight

city blocks without rest or severe pain. R. 278.  Additionally, Dr. Nourbash noted

that the Claimant could stand for over two hours before needing to sit down, sit and

stand/walk for at least six hours in an eight hour workday, should walk during an

eight hour workday approximately every ninety minutes, would sometimes need to

take unscheduled breaks during an eight hour workday, could rarely carry fifty

pounds, could frequently climb stairs and twist, and could occasionally climb

ladders. R. 279-80.  Dr. Nourbash noted that the Claimant did not need to use an assistive device or cane when engaging in occasional standing/walking. R. 280.  He concluded that the Claimant's impairments would produce good and bad days and would cause her to miss work three days per month. R. 281.  The Claimant told Dr. Nourbash that her pain was tolerable. R. 288.

In June 2008, the Claimant sought treatment for her right hip.  On June 13, 2008, she reported right hip/leg arthritis with pain lasting for the past 2 years, every day, intermittent throughout the day. R. 313.  At that appointment, she listed her occupation as part-time event planner. R. 314.

Correspondence from Dr. David Beigler to Dr. Renata Osadnik dated June 14, 2008, stated that the Claimant's right hip significantly limited her amount of functionality.  Dr. Beigler stated that the Claimant was able to walk only a block without substantive pain and over-fatigue. R. 316.  Dr. Beigler noted osteoarthritis in the right hip and that the left leg was longer than the right by one centimeter. R. 316.

Dr. Beigler performed an anterior total right hip replacement on July 21, 2008, and attributed the need for the surgery to end stage osteoarthritis. R. 317, 373, 376.  In the days that followed, the Claimant received physical therapy, and was diagnosed to require a wheeled walker for home use upon discharge, and thereafter received in-home physical therapy. R. 380-83.  As of August 12, 2008, the Claimant reported no pain or weakness, was able to ambulate "most of the time

without a cane or other assistive device," and was instructed to follow up with Dr. Beigler in two to three months. R. 326.

**D. ALJ's Decision**

First, the ALJ found that the Claimant met the insured status requirements of the Social Security Act through December 31, 2009, and had not engaged in substantial gainful activity since December 17, 2004. R. 18, 21. Second, the ALJ found that the Claimant had the following severe impairments: "degenerative joint disease and osteopenia of the left hip, status post June 21, 2005 total hip replacement (currently stable and asymptomatic); and degenerative joint disease and osteoporosis of the right hip, status post July 21, 2008 right hip arthroplasty." R. 21.

Third, the ALJ found that these impairments did not meet or equal one of the listed impairments. R. 21-22. The ALJ stated the Claimant's "complaints of difficulty with ambulation are given some credence for certain periods, … but the evidence does not reflect that she experienced an inability to ambulate effectively for any consecutive 12 month period." R. 21. The ALJ then found that "the evidence reflects that functional use was restored within a reasonable amount of time after her surgical procedures, as will be discussed further below." R. 21.

Fourth, the ALJ found that the Claimant had a RFC as follows: For the period between December 17, 2004 and April 1, 2007, the ALJ found the Claimant could "perform the full range of light work as defined in 20 CFR 404.1567(b)." R. 22. The ALJ found Claimant "would have been able to stand and walk for at least 6

hours of an 8 hour day, with normal breaks." R. 24. The ALJ also found the

Claimant was limited to "lifting and carrying no more than 20 pounds occasionally

and 10 pounds frequently." R. 24. The ALJ additionally found that, although she

might have briefly met a listing for a period during late 2004 into early 2005, "this

period did not last for 12 consecutive months as she experienced significant

improvement after surgery" and "was capable of performing the full range of light

work," despite some physical limitations. R. 22.

With respect to this finding, the ALJ specifically refused to give what he

described as "full weight" to the testimony from the Claimant and her husband that

her ability to walk throughout the entire period was limited. R. 24. The ALJ stated

that the Claimant's testimony "is inconsistent with the claimant's reports to her

treating physicians." *Id*. The ALJ remarked that "it does not follow that this

claimant, who in the past has apparently been very active and even somewhat

athletic, would fail to mention significant ambulatory difficulties and instead report

100% improvement, no limitations and no need for pain medications if she in fact

had difficulty even walking even (*sic*) one block. … It is probable that [the

Claimant's] physicians would have asked specifically regarding limitations in

weightbearing and/or sitting, and made note of these if they were present." R. 24.

Although the ALJ did not give "full weight" to the Claimant's testimony regarding

her ability to ambulate, he did find the Claimant "somewhat credible." R. 22.

Likewise, the ALJ refused to give Dr. Freeman's opinion full weight "to the

extent that it relies on the Claimant's testimony, which Dr. Freeman admits is

somewhat inconsistent with her medical reports and the opinion of her treating physician." R. 24. The ALJ did not provide any weight to Dr. Freeman's opinion that the Claimant was limited to walking and standing no more than two to four hours in an eight hour day. R. 24. Rather, the ALJ relied upon the treating physician's opinion that, in September 13, 2006, the Claimant was "100% improved" and "denied pain or limitations." R. 23.

For the period from April 1, 2007 through September 30, 2008, the ALJ found that the Claimant's impairments prevented her from performing past relevant work. R. 26. The ALJ additionally found that "the claimant's allegations regarding her symptoms and limitations are generally credible." R. 25. Neither party challenges the ALJ's findings for this period.

For the period beginning October 1, 2008, the ALJ found that the Claimant's disability ceased due to medical improvement. R. 27. The ALJ found improvement because "the evidence does not support the continued need for an assistive device" and because "[t]he record does not reflect significant follow up after [August 12, 2008], suggesting that medical improvement occurred after the surgery and that the claimant regained a good deal of functioning. The evidence does not substantiate exacerbations of pain or a need for follow up treatment which would significantly interfere with her ability to attend work on a consistent basis." R. 28-29. The ALJ then made an RFC finding for the period beginning on October 1, 2008, finding the Claimant to be functional based on the last reported medical record, dated August 12, 2008.

The ALJ rejected the testimony of the Claimant and her husband that her difficulties ambulating continued because the testimony conflicted with medical record evidence and because the Claimant did not submit medical records showing that she "reported continuing and significant pain and functional limitations to treating physicians." R. 28. The ALJ specifically refused to credit testimony that the Claimant's husband had to work from home to assist her daily life, because "as early as August 12, 2008, Claimant reported no pain or weakness and she was ambulating most of the time without an assistive device." R. 28-29. He also found that her abilities exceeded what she claimed at the hearing because (1) in February 2005, Dr. Mehta noted that the Claimant was "newly retired," (2) in September 2006, Dr. Nourbash noted that the Claimant "continues to work full duty," and (3) in June 2008, Dr. Osadnik noted the Claimant's occupation as a "part-time event planner." R. 28.

## II. LEGAL STANDARDS

### A. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). This much is clear regarding the standard of review. If supported by substantial evidence, the Commissioner's factual findings are conclusive. 42 U.S.C. §405(g). If the Appeals Council denies a request for review, the ALJ's decision becomes the Commissioner's final decision, reviewable by the

district court. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). But beyond these axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is narrow. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely limited"). The district court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standard in reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds could differ concerning whether a claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp. *Scott v.*

*Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not

substantial evidence. *Id.* Moreover, a reviewing court must conduct a critical

review of the evidence before affirming the Commissioner's decision. *Eichstadt v.

Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks

evidentiary support or adequate discussion of the issues, then the court must

remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed,

even when adequate record evidence exists to support the Commissioner's decision,

the decision will not be affirmed if the Commissioner does not build an accurate and

logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539,

544 (7th Cir. 2008).[3] And, unlike most civil litigation in which a decision can be

affirmed on any basis in the record, federal courts cannot do so in Social Security

appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he

*Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on

grounds that the agency itself had not embraced.") *with Brosted v. Unum Life Ins.

Co.*, 421 F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record").

Therefore, the Commissioner's counsel cannot build for the first time on appeal the

necessary accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*,

2013 U.S. Dist. LEXIS 72876, *21 (N.D. Ill. 2013) ("[T]he court's review is limited to

---

[3] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g., Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano*, 556 F.3d at 562. But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D. Ill. 2012). Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge: "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544.

the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief.").

## B. Duty to Develop the Record

The claimant and ALJ share responsibilities for building the record. However, it is the claimant's burden to submit medical evidence to prove her disability. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (quoting 42 U.S.C. 423(d)(5)(A)) ("[a]n individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."); *Scheck v. Barnhart*, 357 F.3d 697, 701-02 (7th Cir. 2004), ("claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."). *See also* 20 C.F.R. §§ 404.1512(a), 416.912(a) ("In general, [claimants] have to prove to [the Social Security Administration] that [they] are … disabled. This means that [claimants] must furnish medical and other evidence that [the Social Security Administration] can use to reach conclusions about your medical impairment(s)."); 20 C.F.R. § 404.1512(c) (claimant "must provide medical evidence showing that [claimant has] an impairment(s) and how severe it is during the time" [claimant states] that [claimant is] disabled. [Claimant] must provide evidence, without redaction, showing how [claimant's] impairment(s) affects [claimant's] functioning during the time [claimant states] that [claimant is] disabled…"). More specifically, the claimant has the burden to submit evidence proving her RFC at Step Four. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th

Cir. 2007); *Luster v. Astrue*, 358 F. App'x 738, 741 (7th Cir. 2010); *Allen v. Sullivan*, 977 F.2d 385, 387-88 (7th Cir. 1992).

On the other hand, the ALJ has the duty to develop the medical record. *See* 20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history"). The Seventh Circuit holds that the ALJ has not failed to adequately develop the record where the claimant does not show they were prejudiced by a lack of development. *Martin v. Astrue*, 345 F. App'x 197, 202 (7th Cir. 2009).

Thus, when the claimant argues the ALJ has not sufficiently developed the record, claimant must point to specific medical records the ALJ failed to request. "In order to obtain a remand for failure to develop the record, 'a claimant must set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider.'" *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1143 (N.D. Ill. 2012) (quoting *Nelms*, 553 F.3d at 1098). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Id.* at 1143 (quoting *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994)). Moreover, the Seventh Circuit permits the ALJ to assume a claimant represented by counsel is making their strongest case for benefits. *See Wilkins v. Barnhart*, 69 F. App'x 775, 781 (7th Cir. 2003) (citing *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir.1987)).

## C. Disability Standard

Disability insurance benefits are available to a claimant who can establish that she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-740 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if she is unable to perform her previous work and cannot, considering her age, education, and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. § 423 (d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. § 404.1572(b).

The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i – v). Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's RFC; and (5) whether the claimant is capable of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740. After the claimant has proved that she cannot perform her past

relevant work due to the limitations, the Commissioner carries the burden of showing that a significant number of jobs exist in the national economy that the claimant can perform. *Schmidt*, 496 F.3d at 841.

## III. DISCUSSION

The Claimant seeks a reversal or remand of the ALJ's decision denying benefits for three reasons. First, the Claimant contends that the ALJ ignored evidence favorable to her when giving only limited weight to the opinion of impartial medical expert Dr. Freeman, who found it more likely than not that the Claimant had accurately described her limited ability to ambulate, and so met Listing 1.03. Second, the Claimant contends that the ALJ ignored evidence favorable to her when determining her RFC and concluding that she could perform light work before April 1, 2007. Third, the Claimant contends that the ALJ failed to properly assess and develop the record when concluding that she was no longer disabled as of October 1, 2008.

### A.    Dr. Freeman's Opinion

The Claimant argues that the ALJ erred by giving greater weight to her treating physician's reports that she improved 100% without addressing the post-hearing opinion of medical examiner Dr. Freeman that "more likely than not" Claimant "was providing a factually accurate description of her ambulation ability," "that such was being overestimated by her treating physician, and that listing 1.03 is met." R.441. The ALJ gave only "limited weight" to Dr. Freeman's opinion because it "relie[d] on the claimant's testimony, which Dr. Freeman admits is

somewhat inconsistent with her medical reports and the opinion of her treating physician . . ." R. 24. Although the ALJ did not specify the inconsistency, Dr. Freeman's opinion focused on a discrepancy about the Claimant's ability to walk. Specifically, Dr. Freeman noted that the Claimant testified at the hearing that she "can not exceed a half block of walking distance" while her treating physician (presumably Dr. Nourbash) found an only "mild to minimal limitation in walking." R. 440.

An ALJ must give a well-supported treating source opinion regarding the nature and severity of his patient's condition controlling weight when such opinion is 1) supported by medical findings, and 2) consistent with other substantial evidence in the record. *Collins v. Astrue*, 324 F. App'x 516, 520 (7th Cir. 2009); SSR 96–8p. However, the ALJ may not consider only the reports of treating physicians without also taking into account "all relevant evidence." *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (internal quotation marks and citation omitted). Furthermore, the ALJ cannot simply ignore evidence favorable to the claimant but, rather, must explain why he rejected the favorable evidence. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

In his decision, the ALJ relied only those parts of Dr. Freeman's opinion that did not favor the Claimant while failing to address parts that favored her. Specifically, the ALJ cited to Dr. Freeman's opinion that the Claimant's testimony was somewhat inconsistent with her medical reports and the opinion of her treating physician, but did not acknowledge Dr. Freeman's resolution of the inconsistency.

Dr. Freeman explained that the inconsistency likely resided in "misperceptions of reality on the part of both the treating physician and the individual herself."  R. 441.  Dr. Freeman stated that mismatches between the arthritis noted in the MRI and x-ray and those reported at surgery, as well as less severe arthritic change than usually accompanies arthroplasty, "strongly suggests the treating physician was relying on superficial impressions rather than well established (*sic*) data" in determining the utility and success of the surgery.  R. 441.  In other words, "the surgeon's mindset that the surgery 'should have been' successful appears to have influenced his assessment of how successful the surgery had been."  R. 441.  Dr. Freeman also considered that, because the Claimant was physically active before her injuries, she was more likely to be "disappointed with the result of arthroplasty, particularly if done in a setting of only moderate arthritic damage.  The functional recovery for individuals in situations like this tends to be significantly worse than usual, due to the marked discrepancy between expectation and reality of the outcome."  R. 441.

Ultimately, Dr. Freeman found it more likely that the Claimant's description of her ambulatory ability was accurate, and discounted the treating physician's assessment.  Specifically, Dr. Freeman concluded "it is more likely than not, that the individual was providing a factually accurate description of her ambulation ability as it actually existed after surgery, that such was being overestimated by her treating physician, and listing 1.03 is met."  R. 441.  To support this conclusion, Dr. Freeman noted that "the medical reports in file also contain no indication that the

treating physician actually observed the stated level of activity by the individual." R. 441.  Lastly, Dr. Freeman noted that a consulting examiner's finding of "right lower extremity weakness" was "consistent with the claimant's statements regarding ability to walk, but is inconsistent with both the functional estimates and examination findings of the treating physician and suggests error in either or both such findings and statements by the treating physician." R. 441.

By citing only the portion of Dr. Freeman's opinion that identified an inconsistency between the Claimant's testimony and the opinion of her treating physician, the ALJ misrepresented Dr. Freeman's opinion, which actually found it more likely than not that the Claimant's testimony was accurate and that she met a listing.  An ALJ cannot pluck one favorable comment from an opinion where failing to acknowledge its context results in a mischaracterization of the nature and content of the opinion.  *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009) (remanding where ALJ mischaracterized the record); *Triplett v. Colvin*, 12 C 4382, 2013 WL 6169562, *7 (N.D. Ill. Nov. 25, 2013) (an ALJ cannot "merely mine the record for a few isolated gems of good cheer.").

The Commissioner did not respond to the Claimant's argument that the ALJ erred by mischaracterizing Dr. Freeman's opinion.  Rather, it argued that the ALJ was free to reject Dr. Freeman's opinion because credibility is decided by the ALJ, not Dr. Freeman.  However, in giving limited weight to Dr. Freeman's opinion, the ALJ did not independently assess the credibility of the Claimant but, rather, adopted a conclusion the ALJ attributed to Dr. Freeman that the Claimant's testimony was inconsistent with the opinion of her treating physician.  However, as

noted above, the ALJ mischaracterized Dr. Freeman's conclusion, and therefore the ALJ has failed to build a logical bridge between the record and his decision to give little weight to Dr. Freeman's opinion. *See Berger*, 516 F. 3d at 544 (an ALJ must build a logical bridge between the evidence and his conclusion).

Alternatively, the Commissioner argues that the ALJ was free to give little weight to Dr. Freeman's opinion because the Claimant testified she could walk one-eighth of a mile, and therefore Dr. Freeman was wrong to credit her testimony of limited ambulation. However, the Commissioner distorted the Claimant's testimony. Although she initially testified that she could walk a block and back, an ensuing exchange demonstrated marked confusion between the Claimant, the ALJ, and Dr. Freeman over the length of a city block. *See supra* at 5-6 (quoting R. 469-70). Ultimately when Dr. Freeman and the ALJ asked the Claimant if she could walk an eighth of a mile meaning either "[o]ne full city block" or if in Chicago "two downtown blocks," the Claimant responded "that's too long." R. 469-70. In any event, the ALJ did not cite this exchange in rejecting Dr. Freeman's opinion that the Claimant more likely than not met Listing 1.03, and so the Commissioner cannot rely on it on appeal. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (the Commissioner cannot prevail based on a post-hoc rationale).

In summary, the ALJ's gave little weight to Dr. Freeman's opinion because it relied on testimony from the Claimant that Dr. Freeman allegedly found to be inconsistent, without addressing any of the reasons Dr. Freeman believed the Claimant's testimony to be more likely than not accurate. As a result, the ALJ's

decision does not build a logical bridge between the evidence and his conclusion, and therefore the conclusion was not grounded in substantial evidence. For this reason alone, the case must be remanded. And because Dr. Freeman's opinion that the Claimant met a listing was not temporally limited, the ALJ should evaluate the opinion against the backdrop of the entire period for which the Claimant seeks benefits.

**B.    RFC Before April 1, 2007**

Although the Court has already concluded that this case must be remanded for further consideration of Dr. Freeman's opinion that the Claimant met a listing, for the sake of completeness the Court briefly addresses the parties' other arguments. The Claimant argues that the case should also be remanded because the ALJ failed to identify support for his RFC determination for the period before April 1, 2007. Specifically, the Claimant contends that the ALJ did not support his conclusion that she could perform light exertional activity during that period, and failed to address contrary evidence such as testimony from the Claimant and her husband, the consulting examiner's reports, and her treating physician's records.

The source of the ALJ's RFC determination for the period prior to April 1, 2007, was not identified. The ALJ cited no support for his determination that the Claimant was able to "stand and walk 6-8 hours" a day for the period before April 2007. R. 24. Support cannot be found in the RFC determinations by Dr. Nourbash or Dr. Bone because both assessed her abilities after April 2007 during the period the ALJ found her to be disabled. *See* Dr. Bone RFC dated July 24, 2007 (R.246-53);

Dr. Nourbash RFC dated October 3, 2007 (R. 276-82). Moreover, Dr. Bone found that the Claimant could stand for only two hours with an assistance device, R. 247, and Dr. Nourbash found that she could sit and stand/walk for at least six hours during an eight-hour work day, R. 279, in contrast to the RFC the ALJ adopted that would require the Claimant to "stand and walk 6-8 hours" which made no allowance for sitting or an assistance device, R. 24.

Although the ALJ acknowledged that at times the Claimant may have been incapable of performing light work and even briefly met Listing 1.02 or 1.03 before April 1, 2007, he also found that "this period did not last for 12 consecutive months as she experienced significant improvement after surgery" and therefore "within one year of her onset date" remained "capable of performing the full range of light work." R. 22. However, the evidence of improvement consisted of statements purportedly made by the Claimant as reported by Dr. Nourbash that she was doing "really well" and by September 13, 2006 was "100% improved." R. 23. As discussed above, the ALJ failed to address Dr. Freeman's opinion that the Claimant's own statements of limited ambulation were more consistent with the record overall than were the reports of Dr. Nourbash. While the ALJ was not required to adopt Dr. Freeman's conclusion that Dr. Nourbash's observations were more than likely not accurate, as detailed above the ALJ did not address Dr. Freeman's attempt to reconcile the statements of the Claimant and the observations of Dr. Nourbash. Without confronting the evidence that Dr. Nourbash's reports of 100% improvement were inaccurate, the ALJ failed to build a logical bridge between the evidence and

his conclusion. *See Terry*, 580 F.3d at 477 ("Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling.").

Because the ALJ identified no support for the pre-April 1, 2007, RFC determination, his opinion did not rest on substantial evidence, providing another basis for remand of his decision denying benefits for that time period. *See Lewis v. Astrue*, 518 F. Supp. 2d 1031, 1040-41 (N.D. Ill. 2007) (ALJ must explain why medical evidence before and after a given date points to that date).

## C.    RFC After October 1, 2008

The Claimant also argues that the ALJ erred when he found that by October 1, 2008, medical improvements allowed her to regain the RFC to return to light work and her past relevant work. To the extent that the Claimant and her husband testified that her mobility was still limited after October 1, 2008, the ALJ found the testimony to be unsupported by the medical record because the Claimant had not reported continuing pain and functional limitations to her treating physicians. R. 28. The Claimant contends that, in fact, records through the hearing date supported her claim of limited mobility. Further, she contends that the ALJ should have asked for records from after the hearing date before concluding that her complaints of pain had stopped.

The only medical record the ALJ cited as evidence of medical improvement was dated August 12, 2008, in which the Claimant's second hip surgeon, Dr. David Beigler, reported that she was "ambulating most of the time without a cane or other

assistance device" and reported "no pain and no weakness." R. 326. He "asked that she follow up with me in 2-3 months for routine followup including x-rays." *Id.* Based on the report, the ALJ concluded that "the evidence does not support the continued need for an assistance device with even occasional standing and walking." R. 29. Yet Dr. Beigler reported that the Claimant could do without an assistance device *most* of the time, not *all* of the time. R. 326. In addition, although the ALJ concluded that the "record does not reflect significant follow up after this," R. 29, in fact Dr. Beigler called for a follow-up appointment with the Claimant's surgeon. R. 326.

The Claimant contends that the ALJ also erred by relying on the absence of medical records from after October 1, 2008, to conclude that she must have regained her prior functioning. The Claimant argues that she provided all of the records predating the December 4, 2008, hearing, and the reason for the absence of records from after the hearing is that the ALJ never requested them before issuing his decision seventeen months later on May 17, 2010. While the burden falls on a claimant to substantiate her claim with medical records, an ALJ also has a duty to develop the record. *See Nelms*, 553 F.3d at 1098. However, to obtain a remand for failure to develop the record, a claimant must identify the relevant evidence the ALJ failed to procure. *See id.* ("a claimant must set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider."); *Binion*, 13 F.3d at 246 ("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.").

Although the August 12, 2008, note by Dr. Beigler should have alerted the ALJ to inquire into whether follow-up visits occurred, the Claimant has identified no records showing that had the ALJ inquired, follow-up records existed. Nevertheless, the records on which the ALJ relied do not support his conclusion that by October 1, 2008, the Claimant no longer needed an assistive device or follow-up treatment. Accordingly, the ALJ did not build a logical bridge between the record and his conclusion that by October 1, 2008, the Claimant could resume her prior work. *See Just v. Astrue*, No. 11 CV 1856, 2012 WL 366929, at *6 (N.D. Ill. Feb. 1, 2012) (remanding where ALJ mischaracterized medical record and selectively cited evidence). Therefore, for this additional reason the Claimant is entitled to a remand of the portion of the ALJ's order finding her not disabled since October 1, 2008.

## IV. CONCLUSION

For the reasons stated above, the Claimant's motion for summary judgment [24] is granted. The matter is remanded to the Commissioner. The Commissioner's motion for summary judgment is denied.

It is so ordered.

Entered:  June 11, 2014

_____
**Iain D. Johnston**
**United States Magistrate Judge**

- 33 -